Good morning, Your Honors. My name is Anthony J. Marlowe, and I represent the claimant appellant Victor Fernandez in this matter, and I would be prepared at the Court's pleasure to either answer any questions you may have and reserve my argument or state some of the issues. How do we have appellate jurisdiction? I don't think there's a final order in this case. We've done everything we can to figure out what the district court is sitting on, but it's sitting on something, taking it under consideration, and it hasn't done anything. So it appears that we don't have a final order, do we? We have actually, as to the forfeiture agreement, Your Honor, strike that. As to the Eighth Amendment forfeiture hardship, the Court said that it gave a strong tentative denial of that, of offering any relief, but said that it would look again at Bozsikagy and then come back with a written order. And it hasn't, and we've called the office to make sure Pacer was right, and they've told us there is no order. Yes, Your Honor, and I myself, on three occasions, I believe prior to filing my appellate brief, contacted the clerk of Judge Ciavelli, and she said she'd speak with him, and he would send one, and we never got one, and I just couldn't sit on my hands and not do anything. So I filed it. How do we have appellate jurisdiction, then? Well, Your Honor, I would say that the Court looked at the Bozsikagy case and said, you know, I'm not going to change my tentative. My tentative stands, no order needed. That would be my speculation at best. See, that's the problem. I mean, without a final order, we're up against a wall. How can we get over or around that wall? Maybe we could hear this case and take it under submission and request an order from Judge Ciavelli, and that sounds good to me. Why don't you go ahead, and I'll give the merits. Thank you. Your Honor, I'd like to begin with the summary judgment motion that I had made in this case. The error that we're claiming there was that the district judge, Ciavelli, he applied the wrong legal standard as to this forfeiture case. His order stated that there was competing evidence, and based on this competing evidence, this summary judgment is not warranted in this case, where the legal standard requires under 983 preponderance of the evidence. So we believe that we were denied the wrong legal standard, which is, you know, denial of Fifth Amendment. I read that as simply saying there is a genuine issue of material fact that has to be determined based on competing evidence. I think you said this competing evidence. I had it here, Your Honor. I can go to it if you'd like. I think that's what we'd like you to do. Thank you. I mean, you're complaining both about that and the substantiality of the evidence supporting the verdict, right?  You're also challenging, on the same grounds, the substantial evidence supporting the verdict, right? Correct, Your Honor. It's exactly the same issue. If there was not enough to go forward in summary judgment and the same evidence was presented at trial, then there wasn't enough substantial evidence to support the verdict. So it really doesn't matter, does it? Your Honor, is the court alluding to the Ninth Circuit's horizontal stare decisis under general signal where if summary judgment's really not reviewable after a jury verdict? I'm saying it doesn't matter, does it? Because you're claiming that there was insufficient evidence to support the verdict. Yes. It doesn't matter whether you win in summary judgment or you should have won at the jury stage. You don't get any advantage by arguing one or the other, do you? Well, Your Honor, the evidence at the time of the summary judgment motion was different than the evidence in Plaintiff's case in chief and the evidence in my case in chief that went to the jury. I see, okay. I think there is a difference. And we're also challenging the directed verdicts. Well, but then isn't it true that if you did get the nice summary judgment and you go to trial and then we can't review the summary judgment motion? Your Honor, yes, with the exception of what the court has called the special cases that we cited where there were statute of limitations issues or qualified immunity issues or circle of limitation issues. And in this case where the court applies the wrong legal standard and I'm denied, the claimant is denied his day in court, I think it's no less important than the other special cases that the Ninth Circuit has found that it could, without violating its there decisis. Yeah, I don't know how we get to cover your case without making every interlocutory summary judgment reviewable after verdict. I mean, this, applying it to your case, would swallow up the rule. I think you better talk about the verdict. Okay. Yeah, Your Honor, the, and you just want me to skip over the directed? Do whatever you want, I'm just telling you. Well, Your Honor, the directed... You've got 14 minutes and counting, so... Yeah, well, at the directed verdict stage, Your Honor, the government's case in chief, it showed no connection, narcotics activity with the currency in question. There was no evidence of that other than speculation? Well, let's see what there was. There was the fact that dogs barked. Okay, this was a case of the dog that did bark. And there was evidence that Mr. Fernandez had been involved. By his own admission, he had some drug problems, but I thought there was some evidence that he was involved in some drug activity in the past. Correct me if I'm wrong. Yes, Your Honor, I will. Your Honor, as far as the drug activity, the only evidence at all from the inception of this case was when Mr. Fernandez was questioned by investigator Leahy, he was asked if... He was asked regarding his alleged marriage to Marina Vasquez, and Leahy wanted to know, are you married to her? And he said, we were at a wedding one night, we had a drug problem, and we got married. And at trial, I asked Leahy specifically, when he told you he had a drug problem, was it that night? He says, yes, that night. That was the only evidence of any drugs in this case that ever came up in terms of... We don't know what he was alluding to, whether he was talking about we took some drugs and did something thoughtless, or she owed me some money for drugs that I'd sold her, and we decided to settle it by having her marry me. Both of those would be drug problems. Yes. We don't know which kind of drug problem this was. Maybe it was an aphrodisiac problem. Who knows? But that's what I mean, Your Honor, for the government to take that as evidence of a drug connection. What else was this? It was the barking dogs. Yes, Your Honor. There was the history of, I mean, whatever we just talked about. What else was there? Your Honor, with the dog, with the barking dogs, I did spend quite an amount of time in my briefs arguing why this court should discount that, and why the district court should have discounted that. And I considered it as error, because in this particular case, the dog, based on the evidence, did not do a sophisticated alert, as this court has discussed in U.S. v. 22-474. And this court in 30-60, U.S. v. 30-060, discounted a dog alert that was not sophisticated. And also, there was no evidence as to the dog's training with respect to those sophisticated dogs. Your Honor, the only evidence of this dog's training came twofold. It was submitted by declaration that he alerts to five drugs, cocaine, methamphetamine, opium, heroin, and marijuana. There was testimony at trial that this officer did not train this dog to alert specifically to methylbenzoate, the byproduct of cocaine, that he never heard of any dog training specifically to detect methylbenzoate, the byproduct of... He must not read our opinions. I'm sorry? He must not read our opinions. Well, he had in recent close proximity with drugs pretty down pat in his testimony, but then he couldn't describe in a time sense either days, weeks, or months what he meant when he said that the dog's alert told him that the currency had been in recent close proximity to drugs. And I believe the jury discounted it, because the jury found $151,000 that was in the safe not to be connected to narcotics trafficking, and $70,000 that was in the briefcase. Actually, it was $74,850. The jury said $78,050 was. So the jury, I believe, discounted the dog alert also, Your Honor. Wasn't there testimony that this dog did not just alert to currency in general circulation? That the dog only alerted under circumstances strongly suggestive of recent contact with drugs? Well, there was testimony that the dog, excuse me, did not alert on currency in general circulation. Also, that he was proofed off clean currency, was that he only would alert to the odors emanating from those five specific drugs. Isn't that the same as a sophisticated alert? That's what you're trying to avoid is a dog just alerting to anything under the sun. I read that as saying this is a sophisticated dog that only alerts under special circumstances. Your Honor, my understanding of this Court's decision in U.S. v. 22-474 is that a dog that only alerts to the byproduct of methyl benzoate and not cocaine itself does a sophisticated alert. And as I'd indicated in my brief. Because it suggests recent proximity to cocaine, whereas much currency in circulation is in contact with drugs at some point. Yes, Your Honor. And also the fact that methyl benzoate evaporates very quickly. And that's another strong indication that the currency was in recent close proximity to drugs. So it seems to fly in the face of reason that if a dog is also trained to detect the odor of marijuana, which everybody knows just lasts forever, a long time, is very pungent. Then, you know, how can he be a sophisticated dog if he alerts also to marijuana and not specifically to methyl benzoate? I think that cuts the arc. Is that in the record? Marijuana gets on something and it stays there forever? It's in the record, Your Honor. When I cross-examined the officer that... I have it here. Can I get a sip of water real quick? I'm kind of dry. May I? Thank you. Okay. Okay. The deputy never heard of any dogs training only on methyl benzoate. He keeps narcotics in his car for training purposes for six months at a time. Cannot determine what recent close proximity in terms of days, weeks, or months is. Well, I don't have it in my notes, but I know any questions about it. Well, so it's not in the record. Just everybody knows. You want us to take judicial notice of that? That it's not in the record? No. Well, okay, that it's not in the record and it stinks up money forever. Never mind. Let's go to something productive. Well, that's not really controversial that much currency in circulation... We've said that many times, that much currency in circulation has been in contact with drugs and will have the scent of drugs on it. We've said that many times. And obviously, dogs are trained not to alert to small quantities. Otherwise, they stop everybody in the street. Everybody, I suspect, in this courtroom has a dog. Two dollars in their pocket or purse. So you have to somehow train the dog to avoid alerting people with small quantities of currency. But that doesn't go to the question as to whether or not this dog was specifically alerted to that substance. It only remains in the currency for a short time after contact with cocaine, right? Your Honor, the... And that is in the record. That is in the record. What, Your Honor? I'm sorry. That these dogs were not trained specifically to alert to methyl benzoate or whatever that substance is. That is in the record. Yes, Your Honor. The officer never heard of that.  What about the bundling and the notes? That's something the court relied on. Yes, Your Honor. As far as the bundling, another interesting issue where there was two stacks of currency. Well, the bundling, all the currency was bundled in $1,000 increments or $3,000 increments. I mean, I personally, they can say that this is conducive to drug traffickers and what they do. But business people and anybody else who transports or stores large amounts of currency, most people bundle this so they can keep track of what they have. What do you do with the IRS records that showed basically no visible means of support and tons of cash sitting around? Well, the officer himself said it could have been from a skimming operation. I mean, you know, and I said, well, if it was from a skimming operation, then it wasn't from narcotics proceeds, correct? And he said, correct. What were the notes all about? Okay. There was two notes, Your Honor. One note said on it, it had $1,000 in it. And it had a note in Spanish, to David from Jose. It was at trial, my client testified that David said to David Fernandez from Jose Fernandez. David Fernandez is my client's father. My client testified that he was planning on taking a trip to Mexico and that was the money that he was going to bring to his father. The second note on the currency was to Victor, my client, from Gerardo, his stepson. And it was, I think, $3,000 in that, Your Honor. And Gerardo testified at trial that that was a loan that Victor had made to him, my client, you know, several, a year or so before, and that that was repayment for the loan. And my client had testified to that. And lastly, there was some currency with an insurance document. I think that was the one that had $3,000 in it. The other two may have only had $1,000. An insurance document wrapped around it. And there was a note on that that said, we are now $3,000. Thank you, Vic. That's when my client testified when his restaurant got robbed and that was the insurance payment. So those were the extent of the notes, Your Honor. There was no indicia. Excuse me. The insurance company gave him $3,000 in cash payment for a robbery? No, no. He got a check. But the way he keeps track of his money, he cashed the check and segregated the money and said this was from the insurance company. Thank you, Vic. $3,000. I don't know why he would, you know. Was the check in evidence? There was no check, Your Honor. He cashed the check and got the cash. And he retrieved the check? From the bank? Nobody did, Your Honor. And that was the extent of it, Your Honor. My area of practice is the criminal law, Your Honor. And I do several narcotics cases where there's all kinds of indicia. I mean laundry notes of transactions. There was even a computer in this home that was seized that was sent out to forensic testing and came back clean. After the April 3rd incident where this money turned up, a month later they searched his two restaurants and his residence. And again, they didn't come up with anything. Where did your client say the money came from? My client said the money came from $30,000 of it was profits from his restaurant. $57,000 was money that his sister brought back from Mexico, which were the proceeds of his parents' sale of the home there. $18,000, and that would have been in March of 2003. $18,000 was brought back with his parents and my client in 2002 when his parents sold their property because they were planning on relocating to the U.S. And they brought back the $18,000 in the car. And my client sold some of his property in Mexico for a down payment of $15,000. And he spent $3,000 and brought back $12,000 of that all by car. And also, my client has a little cattle operation he testified to in Mexico. And some of that money was the proceeds from the cattle. And the balance of it was what he claimed to be his life savings for a period of 20 years. Did the parents corroborate that testimony in terms of sale and transfer of cash? The parents didn't come in to testify. The sister testified to that, Your Honor. Was she a first-person witness to that? Yes. Yes. Well, when she went to Mexico to bring her parents back, that's when the parents had the $57,000 because they had sold their property. And they were going to relocate here. And the sister wanted to get them to bring them across. And that's when they had the trouble at the border because their passports or visas or whatever they had had expired. And so the parents couldn't come across. And the sister brought the money. But as far as being an eyewitness... It was brought across illegally. It was brought across in violation of 31 U.S.C. 5316 because it was not declared. Whether there was an intent to evade a concealment to evade a reporting requirement, that's another issue, Your Honor. Was there any corroboration by way of documents of the cattle sales and transactions? None of the cattle sales and transactions, no, Your Honor. And I can't say that the sister was an eyewitness to the sale of the parents' home. All I can say is what they testified to, that the parents... The sister did bring some cash over, right? The sister? Yes, Your Honor. And she also admitted that she knew about the currency reporting requirements. She did. So the portion of the cash that she brought over would have been willful in violation of... She would have willfully brought it in. I mean, there was support for finding that she did so in willful violation of reporting requirements. Your Honor, she did... She testified at trial that she was aware of the currency reporting requirements. But when she brought the money on the bus, she wasn't aware that the cash was in the briefcase or in the suitcase at the time because of the confusion with the parents not being able to get across. So she said, I was aware of the reporting requirements, but I was not aware of the money in the suitcase. And nobody asked us on the bus to report any currency. I understand. Okay. You are out of time. We'll hear from the government. Thank you. Good morning, Your Honors. May it please the Court. Greg Parham for the government. Along with me, Your Honors, is Stephen Welk. In the event the Court wishes to discuss any issues with respect to the jurisdictional issue, Mr. Welk would be available to discuss that. Is there any reason we shouldn't just hold the case and send a message to Judge Ciavelli, to Fisher-Cudbate? The government doesn't believe there's any reason at all, Your Honor. We found this issue Wednesday and Friday. He's had plenty of time to deal with it. Maybe he's forgotten. There's certainly no point in having... waiting for them and having the further parties brief the case again or anything of that sort. I understand that. I'm not an apologist for Judge Ciavelli, but I suspect that as soon as he saw the notice of appeal filed, he thought he was divested of jurisdiction and chose not to do anything further on the case. Uh-huh. We could do a limited remand for that purpose. Excuse me? We could do a limited remand if... All right. Anyway, go ahead and address the merits. I will, Your Honor. With respect to what I would like to generically refer to as the narcotics-related currency theories of the government's case, the Court's already touched on some important factors. And it's important to, I think, emphasize that this case was tried to a jury. A jury sat and listened to all the witnesses that came forward. Yeah, but juries are wrong sometimes, and I just can't see where there's evidence enough here to tie this money to drugs. I mean, the fact that the dogs barked isn't all that helpful to you. Dogs will bark at large quantities of currency. You know, you take all the money in this courtroom, and you put it somewhere, and the dogs will bark. It's just the way it is. And the fact that they don't bark at a few dollars in somebody's pocket is part of their trading. Otherwise, they're always barking. They won't stop barking. So that part wasn't persuasive. They were asked whether or not they had the special training for that chemical that's only... Methyl benzoate. Right, which stays in currency a short time, and that tells you that the currency has been in contact with cocaine recently. They weren't trained to do that. So you don't have that help you. There's an absence of rational connection here. If I can, I'll recite the factors that I think are important to draw that appropriate nexus for the drug allegation. First of all, there was an extremely large amount of currency, which Mr. Fernandez wasn't adequately able to explain. His tax returns, his own testimony about his expenditures throughout the period in question seemed to belie that. He could have robbed banks. Excuse me? He could have robbed banks. Your burden is to establish the elements of the crime beyond a reasonable doubt. Maybe he robbed banks, and that's how he got it. Correct. And if he did, he would not be guilty of... He would not... This would not be forfeitable as drug money. If that were the only fact, Your Honor? Maybe, you know, he stopped one of those armored trucks and got bags of cash. That's certainly possible, but there were other facts presented to the jury. And I would like to also point out that there was a very suspicious way in which this currency was secured within an unlocked home. The officers testified that there was a briefcase containing $74,000 tucked away in a kitchen cabinet, which was about 12 feet from a back door out of the garage. And there was also the appearance of this individual that had somewhat of a suspicious explanation on why he was at the location. Most of the investigators who testified indicated that the appearance of this individual was a classic drug dealer courier type of situation, where it appeared to them that this Mr. That's really a stretch. Yeah, it's a real laugh. You know, it sort of appeared to them like maybe he was a courier. And the fact that this thing is in suitcases, you know, do drug dealers value their money less than other people? In addition to that, there was testimony... How many people came on this guy, upon this guy? The whole case was originated with a probation check. I mean, he's at the house and the government shows up, right? Correct. How many government people show up? I believe there was about five officers on scene at the time that they wanted to do the probation check of Mr. That. They didn't show up with the dogs, though, did they? No, they didn't. The dog alert came... So all of a sudden there's some guy there and five government officials show up, and the guy gets spooky. And we're supposed to infer from that that it's a drug transaction? Well, not just that. There were other factors as well. There was a discussion about Mr. Fernandez's possible association with an individual by the name of Juan Bonilla. Possible? Possible. And again, it's not too persuasive. Did you try this case? Yes, I did, Your Honor. You must be amazing with juries. I hope I can take that as a compliment, Your Honor. It is meant to be a compliment, but it doesn't tell you how good you are with appellate courts. There were other factors as well. There were cell phones found within the closet with the safe. Officers testified that these types of phones are commonly throwaway phones used by drug traffickers. There was the claimant's admission of having this past drug problem that the courts already noted. But wait. We'll time out. You know, we've talked a little bit about that. It sounds to me like he was under the influence of something, so he got married. That's the drug problem you're talking about? That is the information that we presented to this jury, yes. That's pretty skinny, too. And again, I'm merely relaying the facts as told to the jury. I didn't sit in the deliberation room with them. I only know that they were instructed, I think, appropriately and reached an opinion that we thought was consistent with the evidence. What's really striking about this case, and I spent 23 years in the business, is the absence of the kind of stuff you usually find. You know, ledgers and scales. Yeah, you know all that stuff. And there's none of that here. There was a restaurant. And everybody knows that restaurants are money laundering operations and places where skimming goes on 24 hours a day. That is very, very possible in this scenario. But there was no evidence presented to the jury that Mr. Fernandez was, in fact, using his restaurants as a money laundering vehicle. He didn't say, I skimmed all this money from my restaurant. Excuse me? He did not say, I skimmed all this money from my restaurant. No, he didn't. And that was the other factor that I think the jury considered. And that is, Mr. Fernandez himself, the owner of the currency, had varying accounts of where it came from and didn't even know how much it was. He didn't all have to come from the same place. And the fact that he doesn't know how much it is, I mean, are drug dealers less careful about how much money they have than other people? Maybe he's just Careless with his accounting? Perhaps. I think that he might be careless with his accounting, whether he's a drug dealer or he's a restaurateur. I mean, what does not become more careless? I mean, based on my limited experience, drug dealers can be quite precise about what's owed to them. And I'm very unpleasant if they don't get what they're owed. Oh, absolutely. Absolutely. Your Honor, there was also a fact right before the jury, and that is his distrust of banks. He said, I kept the money in the home because I didn't trust banks. Yet, he had three accounts. It's an old country kind of thing. Oh, he had accounts? Yes, he had three bank accounts that he used regularly. How much was in them? Not much. Well, I mean, you know, sometimes you need to write a check. I mean, it's very hard to run a business without some bank account. Because you receive checks. You may have to clear credit cards. You may have large quantities of cash, some of which you don't want to stick in your mattress. And you need to do something with it. So you need some banking connections to run a business. I need is maybe too strong a term. It's highly convenient. Correct. Now, Your Honor, you've touched on the dog alert in this case. And actually, there was two dog alerts. And both dogs, in the presentation, the evidence concerning them, both handlers testified that their dogs would not alert to currency and general circulation. As Judge Trott pointed out, these, both of these officers were asked a very practical question. Are these dogs in your home at all? Are they ever around money and general circulation? And both of them said yes. And both of them indicated that they're trained in such a way that they will not, will not alert to money and general circulation. Would that suggest this? Will they alert to the amount of money that you have in your pocket? And I didn't see anything that suggested that if you took all the money that people had in their pockets, put together in one place, you know, to amount to. An alert. $300,000, whatever was the quantity here, they wouldn't alert. That he didn't say. But we do have. And furthermore, I don't think it would be true for him to say that. I think what happens is the dogs are taught not to bark at every person on the street. Perhaps to throw some information out for the Court, what Deputy Barger did testify to is that his dog, Jake, did have a track record of currency sniffs, if you will. He said at the time the dog had been involved in 25 instances of doing a sniff test on currency. Out of those 25 times, some of which contained fairly significant amounts of money, the dog did not alert on 14 occasions and did alert on 11 occasions, which suggests, much like the case out of the Seventh Circuit, that this dog, much like Box in the Seventh Circuit case, did in fact have a discriminating nose and could in fact make the. These were not blind tests or anything like that, where they knew which one was and which one wasn't. All we know is the dog barked sometimes and didn't bark at other times. Correct. And we, it's not like a DARPA test where it's been scientifically tested that he always barks when there is and he never barks when there isn't. Admittedly. All we know is that sometimes he barks and sometimes he doesn't bark. For all we know, it's random. Yes. For all we know, he barks on Tuesdays and Thursdays, but not on Wednesdays, Mondays and Fridays, right? Well, Your Honor, what we could surmise from the information submitted to the jury is that in this instance, Jake alerted to the money that was taken out of the briefcase and he alerted to the exterior of the locked safe that was in the closet. And I think, again, this is just one of the aggregate effects. You see what the problem is? The problem is we have said that much money in circulation has a much, you know, money in circulation tends to have a drug residue on it. There's much money in circulation, perhaps all money, everything that isn't just issued, much of the money doesn't just come right out of the Fed. And then you have a situation where we are told sometimes this dog barks and sometimes this dog doesn't bark. Maybe this dog barks sometimes and doesn't bark other times because he's a defective dog. I mean, we don't know. It may be because the quantities of cash were too small in one instance and large in another instance. Without a baseline, without a way of telling why this dog sometimes does and sometimes doesn't, you have to sort of assume the conclusion. And I think in this case, Your Honor, there was an effort to introduce evidence of the contamination theory. And the defense had sought to use the expert testimony of Jay Williams, who is the very same expert used in the 30,060 case. Mr. Williams was unfortunately unable to supply the information that was required under the Federal Rules of Civil Procedure, Rule 26A2, all the data supporting his opinions. And therefore, Judge Schiavelli, I think correctly, did not allow him to testify in this case. So there was no expert testimony on the currency contamination theory before this jury. Now, certainly in all fairness to defense counsel, there were questions asked on cross-examination of the dog handlers about a topic that could be construed as contamination type of theories. But there was no hard and fast evidence. Have these dogs, I don't mean these specific dogs, but are these dogs ever validated? I mean, I know when they stop you, I've heard, not that that ever happened to me, but they stop you with a radar gun, you know, and if you choose to fight it, the officer will come in and say, you know, we tested the radar this morning, the morning of, or if he used a patrol car to follow you, he'll say we, you know, we checked the speedometer on the patrol car and it was working fine this morning. I mean, it was a fairly recent past. There's some sort of validation that the device is being used to provide evidence of accuracy. Right, exactly. Are these dogs ever validated? Is there any kind of DARPA-type program where they say, you know, we have these dogs not only bark when they find a trunk full of marijuana, but they also don't bark if it's a trunk full of hay, or, you know, if you have currency that's been in close proximity to cocaine, they bark, but if it's currency of equal amount that has not been, you know, equal distance, they don't bark. Any kind of validation program like that? There is, and I wouldn't say it was a, I don't think it's the type of validation which is measured by any sort of scientific instruments, but each of these dogs had to go through certification. As the Court, I'm sure, is well aware, one of the dogs who alerted to LOBSAFE, Aiko, was not certified at the time of this sniff. He had been through the complete training. He was trained in all intents and purposes to conduct currency sniffs. How is the certification done? Who certifies, and what is the effect of the certification? Well, the certification, I believe, is conducted by the California Narcotics Canine Association. It's a law enforcement agency that has a protocol or standards that the dogs must meet, and at least with respect to Kenai and Jake, he was, in fact, certified and had cert... Do you know what those protocols are? Are they DAWBOT? Would they pass a DAWBOT validation? I don't know. I don't know, Your Honor. Is it true that the dog doesn't bark? That actually what he does is the handler is trained to observe the dog. They have a standard routine that they follow, and if the dog alerts, he gets very excited and pants and wags his tail, but it isn't a bark, no bark situation. It's a more sophisticated sniffing. Actually, Judge Moy, I think you've touched on a very important point that was discussed by Deputy Barger. There are two things. There is the dog's alert, which Deputy Barger said was the dog's changes in his behavior, whether it be a turn of the head or an excitement in its attitude. Those are the things that the handler is watching for. Whether it barks or whether it sits or whether it scratches at the item, that is a learned response that is trained in these Kenai schools, which corresponds with the other physical behavior that's noted by the dog handler. But we don't know whether it would do the same thing if it was... A female dog in there, for example. I mean, not to make a joke of it, I'm just saying... Oh, absolutely. And I know that that might impact a dog's sense of smell. Let me switch gears just a little bit. Under 53, 16, and 17, the currency smuggling charges in this case, if you segregate that out, is that 57 and 12, so a total of 69,000? It's 57,000 plus the 18,000 plus the 12,000. Plus the 18? Correct. And hopefully my math is correct, but I believe that's the 87,000. But you don't have any showing of willful by the people who carry it over, right? This is smuggling. And so you can't forfeit the whole thing. Well, the willfulness, I believe, could be inferred from the facts. Like what? Well, there's repeated attempts, or actually three successful instances in which currency was brought up from Mexico by the... You know, I've been to Mexico a fair number of times. I've been to Canada recently. And I don't remember a single sign saying, are you bringing in a lot of cash? Now, maybe I don't look like I bring in a lot of cash. Are you dressing jeans? But I don't... I may have been asked once, I don't remember. But I certainly don't remember any big signs saying, here's the narrow, you know, English or anything like that. Certainly when I drove through by car with my family, I mean, you know, it's a big line of cars down in San Ysidro. And I don't remember any signs whatsoever. It's entirely possible to pass through the border without being alerted to the need to report currency. Well, again, Your Honor, I think the jury heard the testimony of the claimant and his family. And claimant's sister admitted that she was aware of the currency reporting requirements. Yet claimant, I think, conveniently indicated that he had no idea about the currency reporting requirements, despite... It may have been convenient, but nevertheless, it is evidence on his side of the scale. The fact that the jury disbelieved them can't be substantial evidence supporting your side. I mean, the sister knew. She didn't say she told her brother. She didn't say she told her parents. And now that I understand the situation correctly, what she said is she came over, she knew about the requirement, but she didn't know she had the cash. So that can be imputed to that cash. So you have sort of a difficult problem showing... At most, you can show failure to declare, which is a violation of what, 36? 53-16. Thank you for these numbers. 53-16, and you can't forfeit the whole thing. I mean, Supreme Court said you can't forfeit the whole thing. Probably, at most, you could do is 5,000 per shipment, because the penalty for each time they bring it across the border is 5,000, right? The maximum penalty. I believe the maximum penalty on a 53-16 may range from as low as 5 or maybe as much as 30,000. And again, I'm not a criminal prosecutor, so I'm not as knowledgeable about the sentencing parameters of that. But I believe there's still a significant range of fines. Do you agree that without a... You agree that if there's not substantial evidence to support a finding of willfulness, can't forfeit the whole thing? Do you agree with that proposition? With respect to the 53-32 allegation, the bulk cash smuggling violation, is that what Your Honor is... I'm talking about the... We're talking about the 80,000. 87,000. 87,000, which is, I think, what your... Total. The total that you referred to. Judge Todd, I'm saying, unless you can find substantial evidence, they not simply transported without reporting, but they transported it knowing of the currency requirement and willfully failing to comply with it. Unless you have that additional element, you can't forfeit the entire thing under Supreme Court authority, right? I think that's in the context of a criminal case under the bulk cash smuggling statute. And I think the government... You don't think Barzhikian extends... I don't... I mean, if you can't have an excessive fine... Well, I don't know. Maybe you can. Maybe you think you can. Do you think you can get more under civil forfeiture statute than a criminal one? I think there's a lesser burden required as far as the elements. Well, you certainly have less of a burden to show. You don't have to prove things beyond a reasonable doubt. Right. But we're not talking about Eighth Amendment. We're not talking excessive fine. Correct. And so Barzhikian just said you can't take the whole thing if all you've got were the maximum fine of $5,000, where you don't show willfulness. But I think the Barzhikian case said there's a range of possibilities that could be forfeitable or subject to forfeiture. And as long as the court has made a consideration of various factors, then it could very well be that the court could find a larger percentage of the money subject to forfeiture and not subject to mitigation. Okay. Unless there'd be other questions. Thank you. Thank you, Your Honor. Did you want to take a minute for rebuttal? Just one minute, Your Honor, just to clarify a few things. The court asked me regarding the marijuana, if it was in the transcript. I apologize. I wasn't able to find it then. I do have it now. It's in the appellant's opening brief on page 24, second to last paragraph. I asked him, okay, which one to you is the most easily for Jake to detect? Answer, marijuana. And which of those five drugs of the odor lasts the longest amount of the time before it dissipates? Answer, I don't know. Yeah, well, the court asked me regarding Judge Giavelli's order, and I also found that while I was sitting down. It's on page 14 when we talk about the competing evidence, first paragraph. Page 14, Your Honor. What are you answering? The court asked me when I was up here earlier, where is Judge Giavelli's order regarding competing evidence? There was a question as to that. And you asked me where it was, or Justice Trotter did, Judge Trotter, in the transcript, and I found it on page 14. At the top. Oh, this is a summary judgment ruling. Yes. All right. Okay. Thank you. Thank you very much. The case is signed. You will stand submitted.
judges: Kozinski, Trott, Molloy